The prisoner was indicted for burglary, and on not guilty pleaded he was convicted, and from the judgment of death thereon he appealed to this Court. Before sentence was passed the prisoner insisted there had been a mistrial, and, for the several reasons herein stated, moved the court to set aside the verdict and grant him a venire de novo, which was refused.
After forming a grand jury there were only eleven jurors of the original panel attending the court, and a special venire for seventy-five other *Page 48 
jurors was awarded. To form the jury, the jurors of the original panel were not tendered first and by themselves to the prisoner, but the names of those eleven persons and of the special venire of seventy-five were put into a box together, and were gone through without forming a jury, by reason of challenges, some peremptory and others for cause. While those jurors were being drawn the solicitor for the State (59) challenged some of them and required that they should stand by until the panel should be gone through, and when the first challenge of that kind was made, the court instructed the clerk to note the names of jurors who might be so challenged, so as, after going through the other jurors of the panel, they might be called back and passed on before ordering another venire. Accordingly, those who had been challenged by the State were thus called back and two of them challenged peremptorily and the third sworn on the jury.
The court then ordered another panel of twelve of the bystanders; and when one of them, who was witness for the prisoner, was drawn and tendered, he was challenged for the State and ordered to stand aside until the panel should be gone through. He did so, and remarked as he was retiring that he was a witness for the prisoner. The other jurors on this panel were exhausted without making a jury, and the clerk believed that Ridge had been excused or discharged on account of his being a witness, and did not recall him, but announced to the court that the whole panel had been exhausted. The prisoner and his counsel knew what Ridge had said, and also that he had not been called back nor his case decided on by the court; and no motion was made on behalf of the prisoner that the juror Ridge should be again tendered to him. But the presiding judge, believing that the previous panels had been exhausted, as had been announced aloud in open court, as aforesaid, ordered another panel of twelve of the bystanders to be summoned, without objection from the prisoner; and of the panel thus summoned the jury was completed. But in forming the jury from this panel the prisoner exhausted his peremptory alleges, and one person was sworn on the jury thereafter.
The trial continued from early in the day until after night, and not being then concluded, a recess was taken to enable the persons concerned in it to take some refreshment. The jury were allowed to go to an adjoining tavern to get supper, and for that purpose were put in charge of a constable, as usual. When they reached the tavern they went into a (60) piazza, when two of the jurors requested the constable to stop and allow them to retire a short distance on a call of nature, and they went for that purpose 30 or 40 yards, and came back without any unnecessary delay. During that period three of the jurors went into the tavern, passed through an ante-room into the eating-room of the house, where the landlady and servants only were, and began their supper, before their fellows came in. *Page 49 
After supper, the court sat and the trial proceeded. When the judge had concluded his charge the jury retired under the charge of a constable, who took a candle and conducted them to their room in the courthouse. When they got to it they discovered that the door was locked, and then one of the jurors took the candle and returned into the courtroom for the key, and immediately returned with it. While that one was gone for the key another juror stepped around the corner of the courthouse upon a call of nature, and came immediately back. The jurors spoke with no person on the subject of the trial, nor on any other subject but that of getting their supper and getting the key.
Objections were also taken to the judge's charge upon the evidence. These will be found fully stated in the opinion delivered in this Court.
Judgment of death having been pronounced against the prisoner, he appealed to the Supreme Court.
The Court is of opinion that neither of the grounds in relation to the jury is sufficient to authorize a venire de novo.
We think it would have been proper to have kept the jurors of the original panel separate from those of the special venire. It was so held inS. v. Benton, 19 N.C. 196. It is true that in that case there were seventeen of the original panel attending, so that a jury might have been formed without any tales jurors, while here there were eleven only, so that resort to the special venire was indispensable. But (61) we think that is not material, because both the State and the prisoner have a right to a jury of the original venire if one can be had; and if a jury cannot be thus formed, they have an equal right to have of the jury such of the original venire as do attend to whom there is no sufficient objection. If, therefore, the prisoner had demanded the original panel to have been first gone through, and it had been refused, and it had happened that the prisoner had been compelled, by exhausting his challenges peremptory, to take a jury before he had an opportunity of accepting or refusing all the jurors of the original panel, we should have thought it erroneous. It would stand upon the same reason with the rule that the improper granting or refusing of a challenge by the court is cause for avenire de novo. But in this case the prisoner was in reality deprived of no right, nor even any of his privileges abridged; for it so happened that every one of the original panel was tendered to him and accepted or refused by him or rejected by the court for legal cause before a jury was formed or his challenges exhausted. Consequently he sustained no prejudice by the alleged irregularity, and the verdict ought not to be disturbed. S. v.Arthur, 13 N.C. 217. *Page 50 
The court made no erroneous decision with respect to the juror Ridge. What the court did as to him was proper — that is, to direct him to stand by and wait the decision upon the challenge of him until the panel to which he belonged had been gone through. That challenge never was decided. But he was not called back for a decision merely from a mistake of the clerk as to the point of fact that the juror was excused for the reason he was a witness, by consent of both sides. Hence that officer declared as a fact that the panel had been perused, although the court had not passed on this juror, and the prisoner and his counsel, with a full knowledge of the truth of the case, acquiesced in that statement, and upon the basis that the panel had been perused and all the jurors had been accepted, challenged, or excused, made no objection to another panel being ordered. Instead, then, of the court having erroneously (62) decided upon the challenge to this juror, it is a case in which by the concurrence of the prisoner no decision was asked from the court. To set aside the verdict in such a case would be to enable the prisoner to annul the most solemn trial by a trick.
The short adjournment of the court for necessary refreshment, and the separation of some of the jurors from the body of the jury upon the occasions and for the very short periods mentioned, do not vitiate the trial. S. v. Kimbrough, 13 N.C. 431; S. v. Miller, 18 N.C. 500. Indeed, there does not seem to be the least ground of suspicion that the verdict could have been influenced by anything that occurred while the jurors were out of the presence of the court.
The counsel for the prisoner took an exception to parts of the charge to the jury, to the proper understanding of which it is necessary to state the parts of evidence. The house that was broken was situated in Davidson County, and belonged to two men named Newsom and Spence, and was used by them as a shop for the sale of merchandise, and also a dwelling-house. The prisoner was a house carpenter, and resided in Randolph County, and was engaged in building a house there, at the distance of about 30 miles from the house of Newson and Spence. On Monday, 8 May, the prisoner was in the shop, had some dealings with Newsom, and paid him three $1 bills, which he saw Newsom put into the till. The house was broken open on the night of Sunday, 14 May. The entrance was effected by boring a hole in the shutter of a window in the shop with a 1 1/2-inch auger, so as to take out a piece large enough to admit the hand, and then the key of an iron crossbar was removed on the inside and the window opened. The appearance of the holes showed that they were bored with a peculiar auger, called an Edding auger, of which none were known in that neighborhood, and that this auger had a gap in it. There were stolen from the till the sum of $10 or $12 in small silver coins, three $1 bank bills, and a South Carolina due-bill for 50 cents. *Page 51 
On the evening of 13 May the prisoner left his place of residence in Randolph County, saying to a witness that he was going (63) on a money speculation; and he returned on Monday evening following.
On Monday morning, 15 May, the prisoner was seen about sunrise, about 1 1/2 miles from the store, going in the direction from the store to his residence. He was walking very fast, and dodged when he saw the witness, though at some distance off, and the witness did not perceive that he was carrying anything. At 12 o'clock of the same day he was seen by another person going in the same direction, 15 miles from the shop. He had his coat off and carried it on his arm, and this witness, also, did not perceive that he was carrying anything else.
During the week following the prisoner passed to a person three $1 bills and a South Carolina bill for 50 cents, which Newsom identified as those that were stolen from the shop. On Monday, 22 May, he also passed to another person $10 in silver change, only one piece of which was as large as 20 cents, the rest being mostly dimes and half-dimes. Of these coins, the owners identified two of the dimes, with particular marks, one half-dime and one piece of 12 1/2 cents.
On Monday, 22 May, the prisoner was arrested at the house on which he was working, and there was found among his tools an Edding auger of the same dimensions with which the holes in the window shutter were bored, and with a gap in it corresponding with the impressions from the gap in the window shutter. A person who worked with the prisoner said that while the prisoner was absent he had not missed the auger, though his attention had not been directed to it.
The counsel for the prisoner, in the course of his defense, contended there was not sufficient evidence that he committed the burglary, and, particularly, that the possession of the stolen money was not sufficient evidence, because, from the lapse of time between the burglary and the prisoner's being seen with the money, he might have probably received it from some other person. And to fortify that position, (64) and also in reply to an argument of the solicitor, founded on the correspondence between the prisoner's auger and that with which the entry had been effected, the counsel for the prisoner further contended that he could not have been the burglar, because, if he then had his auger with him, it must have been seen by the two witnesses who saw the prisoner returning home on the next day after the burglary.
His Honor, in summing up to the jury, stated to them, among other things, that the prisoner had not been seen in possession of the money so recently after it was stolen as of itself legally to raise a presumption that he had stolen the money or, consequently, broken the house. There was opportunity in the interval for some other person to have passed it *Page 52 
to him; and, therefore, he ought not to be convicted of breaking the house on that evidence. But the court further observed to the jury that the possession of the money was nevertheless a circumstance to be considered by them, with other circumstances, tending to show that the prisoner was the person who broke the house; and if the whole evidence satisfied them that he did, then they ought to find him guilty; that it was a material circumstance for their consideration, in connection with the prisoner's possession of the stolen money, that it consisted of a considerable number and various kinds of coin, besides several bills of paper money, and that all of it was in the prisoner's possession, or had been passed by him, as enabling the jury to estimate the degree of probability that the prisoner had himself taken it, or, on the contrary, that some one else had stolen it and passed the whole sum to him in the very pieces that were taken. And in reference to the point disputed between the counsel, whether the prisoner had his auger with him on Monday morning, the court told the jury that they must judge how the fact was from the circumstances. On the side of the prisoner there were the circumstances that the workman with whom the prisoner was employed had not missed the auger while the prisoner was gone, and that the witnesses who saw the prisoner going home did not see the auger. On the other hand, there were the several points of agreement between the (65) auger with which the window shutters was bored and that belonging to the prisoner; and also the considerations that the prisoner might have had the auger, although the witnesses did not see it, as he passed them at a distance, and they did not attend particularly to what he had and moreover, that he might have been able to conceal it in some way, as by taking off the handle, for example, as it could easily be replaced when needed for use, and while the pieces were separated they could be carried without being so readily discovered as when united.
The court further informed the jury that they were the exclusive judges of the credit of the witnesses and of the weight of the circumstances; and that the court presented the subject in different points of view to aid them in their deliberations, and without any intention to intimate an opinion as to the facts; and that the various suggestions submitted to them were to receive from the jury only that consideration to which, in the opinion of the jury, they were entitled.
Though the exception to his Honor's summing up has not been argued by counsel for the prisoner here, yet, as in every other case of the like serious consequence, we have given it our deliberate attention. We regret that we have not had the views of counsel, because, after full consideration, we are at a loss to conjecture what the objections can be. The judge intimated no opinion as to the facts. The very argument for *Page 53 
the prisoner assumed that there had been a burglary committed and the money stolen by some person. Therefore, in noticing that point to the jury his Honor did not err in taking those facts for granted. The only question was whether the prisoner or some other person was guilty; and to that question the circumstances to which the attention of the jury was called and the various aspects in which they might be regarded were relevant and pertinent. The probability certainly is greater that a possessor of stolen property was the thief, if many small articles, and especially of coin, were stolen, and all of them found upon a person shown to be at or near the scene of the theft, than if he had (66) only one or two of them. It was, therefore, fit to lay that view before the jury. So the argument that the prisoner did not have an auger was necessarily noticed by his Honor in the discharging of his duty of summing up, and in so doing he was obliged to explain to the jury the rule in law of evidence as to the difference between affirmative evidence to a fact and the negative testimony of a witness that he did not observe or recollect the fact and make that explanation in connection with the case upon trial. Therefore, it was proper, to enable the jury to carry out the rule, that their attention should be called to the circumstances which would properly tend to weaken in their minds the influence of the negative testimony and induce a belief by them that the prisoner had the auger, though the witness did not see him have it. Those circumstances the court simply recapitulated in order; that the prisoner might have been at such a distance that the witnesses could not see the auger, even if he had it; or, if near enough, that the witnesses had no interest in the matter, and had not their attention excited; or that the prisoner had concealed the auger from observation, which he might have done under his coat that was hanging on his arm, or by taking the handle and barrel apart and carrying them side by side, so as to be more readily kept out of sight. These were probabilities that it was proper to submit to the jury for their consideration, provided they were fairly left with the opposing probabilities to the unbiased consideration of the jury; and we seen othing [nothing] whatever in the case to raise a doubt that the summing up by his Honor was not full and impartial, intended and calucalated [calculated] to aid the jury in coming to a just conclusion on the facts, as the result of their own convictions upon a full deliberation on all the evidences and the discussions of it on both sides.
PER CURIAM. No error.
Cited: S. v. Godwin, post, 404; S. v. Nash, 30 N.C. 37; S. v. Owen,61 N.C. 427; S. v. Durham, 72 N.C. 448; S. v. Patterson, 78 N.C. 473; S.v. Barber, 89 N.C. 526; S. v. Hensley, 94 N.C. 1029. *Page 54 
(67)